## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

CASE NO.:    3:23-cv-358-WWB-JBT

IRENE ROUNDTREE,

       Plaintiff,

vs.

WERNER ENTERPRISES, INC., and
MARLIN FOSTER,

       Defendants.

_____

### PLAINTIFF'S REBUTTAL EXPERT WITNESS DISCLOSURE

Pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, Plaintiff, Irene Roundtree, submits the following disclosure of rebuttal experts which is subject to modification and supplementation based upon additional information adduced in discovery and Plaintiff's continued treatment of her injuries.

    1.    <u>Michael D. Freeman, M.D., Ph.D., MScFMS, MPH, MFFLM, DLM, FACE,</u> Forensic Research + Analysis, P. O. Box 96309, Portland, OR 97296. Dr. Freeman is an expert in the fields of biomechanics, epidemiology and forensic medicine with a focus on issues relating to forensic applications of epidemiology to general and specific causation. Dr. Freeman is expected to testify in rebuttal to defense expert Dr. Sebastian Bawab and regarding the biomechanics and forces of

the crash and how they relate to injuries suffered by Plaintiff Irene Roundtree in the crash. Specifically, Dr. Freeman is expected to testify regarding the methodology, sources, information, applications, evaluations, assertions and conclusions used and provided by Dr. Bawab and all of the information provided in his report and issues related to the crash and the cause of Ms. Roundtree's subsequent injuries and their relationship to the subject crash. Dr. Freeman will base his testimony on his review of the relevant medical records, sworn testimony, crash report, photographs, discovery provided, report and materials provided by Dr. Bawab and his background, training and education. Pursuant to Rule 26(a)(2), Federal Rules of Civil Procedure, Plaintiff discloses a copy of Dr. Freeman's written report, which is attached to this Rebuttal Expert Witness Disclosure and includes information required pursuant to Rule 26(a)(2)(B). Deposition dates can be coordinated amongst the attorneys for the parties.

Dated February 22, 2024.

**PAJCIC & PAJCIC, P.A.**

**/s/ Paul Shorstein**

**PAUL SHORSTEIN, ESQUIRE**
Florida Bar No.: 814431
**STEPHEN PAJCIC, ESQUIRE**
Florida Bar No.: 143485
One Independent Drive, Suite 1900
Jacksonville, FL  32202

Telephone: (904) 358-8881
Facsimile: (904) 354-1180
Email: Paul@Pajcic.com
Secondary email: Molly@Pajcic.com
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on February 22, 2024, I electronically served the foregoing to Heath L. Vickers, Esquire, and Ashton T. Hampton, Esquire, Carr Allison, 200 W. Forsyth Street, Suite 600, Jacksonville, FL 32202, hvickers@carrallison.com, ahampton@carrallison.com, attorneys for Defendant Werner Enterprises, Inc.


**PAJCIC & PAJCIC, P.A.**

**/s/ Paul Shorstein**

**PAUL SHORSTEIN, ESQUIRE**
Florida Bar No.: 814431
**STEPHEN PAJCIC, ESQUIRE**
Florida Bar No.: 143485
One Independent Drive, Suite 1900
Jacksonville, FL  32202
Telephone: (904) 358-8881
Facsimile: (904) 354-1180
Email: Paul@Pajcic.com
Secondary email: Molly@Pajcic.com
Attorneys for Plaintiff



# Forensic Research + Analysis

February 21, 2024

Paul Shorstein, Esquire
Pajcic & Pajcic
1 Independent Drive, Suite 1900
Jacksonville, Florida 32202

Tel: (904) 358-8881

RE:           *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-*
              *JBT, District Court, Middle District of Florida, Jacksonville Division*

Date of Crash:    October 28, 2022
Date of Birth:    *Irene Roundtree:* ████████ [59 years old at time of crash]

Dear Mr. Shorstein,

I am in receipt of your correspondence regarding the above-named action. I have reviewed the documentation accompanying your correspondence including medical records, information regarding the subject crash, litigation documents, and other materials, including the December 18, 2023 report from the defendant's crash reconstruction and biomechanical expert, Dr. Sebastian Bawab. The purpose of this report is to assess the methods and conclusions of Dr. Bawab as they pertain to the injury potential of the subject collision, relative to Ms. Roundtree's post-crash diagnoses and treatment.

**My summary opinions in this matter are as follows:**
- **Dr. Bawab's assertions that the subject collision did not have the capacity to cause any of the injuries indisputably diagnosed in Ms. Roundtree are lacking a foundation in science, medicine, or the facts in this case. Dr. Bawab's methods and opinions are based on a confusing and disingenuous presentation of a novel and distorted approach to causality and a misrepresentation and misuse of published literature.**

- **Dr. Bawab's assertion that the subject crash only produced minimal and benign forces that could not have caused Ms. Roundtree's diagnosed spine and injuries because the forces in the collision were supposedly equal to those of ordinary and**

PO Box 96309, Portland, Oregon 97296 T:971.255.1008

Paul Shorstein, Esquire
Attorney at Law

RE:    *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 2 of 19

**benign activities is not a reliable, relevant, or validated method of assessing injury cause. Using Dr. Bawab's estimated delta V of 4.8 mph for the subject nearside impact indicates that Ms. Roundtree was subjected to violent occupant motion and forces that in no way resemble any of Dr. Bawab's absurdly innocuous comparisons. Such comparisons are demonstrably unscientific and highly misleading, and irrelevant to any disputed issues in Ms. Roundtree's case.**

- **Dr. Bawab's MADYMO computer animated crash test dummy simulation provides no useful information regarding the likelihood that the subject collision caused the injuries diagnoses in Ms. Roundtree after the subject crash. The MADYMO program has never been validated for assessing the cause of an injury after a crash in any individual.**

- **The methodology and principals used by Dr. Bawab to arrive at his opinions regarding the risk of injury from the crash to Ms. Roundtree are not scientifically reliable, either in general or as they were applied to the facts of this case. Despite a superficial appearance of scientific validity, Dr. Bawab's methods are speculative, unscientific, and unreliable, and the resulting conclusions are meaningless.**

*My qualifications to provide opinions concerning the matters herein, particularly on issues of the causal relationship between trauma and injury, are as follows:*

I am Professor and Chair of Forensic and Legal Medicine with the Faculty of Forensic and Legal Medicine of the Royal College of Physicians (UK), and a consultant in the fields of forensic medicine and forensic epidemiology. I am credentialed as a Fellow of the Royal College of Pathologists (UK), Fellow of the Faculty of Forensic and Legal Medicine (FFLM) of the Royal College of Physicians (UK) and member of the British Association in Forensic Medicine. I hold the following relevant academic degrees and certifications: a Doctor of Medicine degree (Med.Dr.) from Umeå University, a Doctor of Philosophy (Ph.D.) in public health/epidemiology from Oregon State University, a Master of Public Health (MPH) in epidemiology and biostatistics, also from Oregon State University, a master's degree in forensic medical sciences (MScFMS) with the Academy of Forensic Medical Sciences in the United Kingdom, *i.a.* In addition to my degreed education, I have completed a 2-year post-doctoral fellowship in forensic pathology at Umeå

Paul Shorstein, Esquire
Attorney at Law

RE:    *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 3 of 19

University in Sweden and hold a Diploma of Legal Medicine (DLM) with the FFLM. I am also a fellow of both the American Academy of Forensic Sciences and the American College of Epidemiology. I am a Fulbright Fellow and held a 3-year roster appointment (2017-20) with the United States Department of State as a Fulbright Specialist in the field of forensic medicine. I serve as tenured Associate Professor of Forensic Medicine at Maastricht University and a joint Clinical Professor of Psychiatry and Public Health and Preventative Medicine at Oregon Health and Science University School of Medicine, where I have taught courses for the past 24 years in forensic medicine, forensic epidemiology, and injury epidemiology. From 2005-2017 I held an appointment as an Adjunct Professor of Forensic Medicine and Epidemiology at the Institute of Forensic Medicine, Faculty of Health Sciences, Aarhus University, Aarhus, Denmark, and am a recent (2020-21) visiting professor at University of Indonesia in the Faculty of Medicine.

I have been a crash reconstructionist since 1996 and have had ACTAR accreditation (the Accreditation Commission on Traffic Accident Reconstruction) since 2005. Over the past >25 years I have participated in the reconstruction of more than 3,000 crashes, including more than 300 fatalities. From 1999 through 2007 I served as a vehicular homicide investigator for law enforcement (consultant to the state medical examiner and special deputy sheriff), and I am a former affiliate medical examiner with the Allegheny County Medical Examiner's office.

I am a member of the American Society of Biomechanics and have more than 60 scientific publications pertaining to injury biomechanics, including a book for the Society of Automotive Engineering and taught injury biomechanics in a faculty peer-reviewed course at OHSU for 15 years. I have served as a consultant on injury biomechanics to state and federal government.

I am an associate editor of the Journal of Forensic and Legal Medicine and serve or have served as an associate editor or editorial board member of 14 additional scientific peer-reviewed journals. I have published approximately 230 scientific papers, abstracts, book chapters and books on topics that include traffic crash injuries, crash reconstruction, injury causation and injury biomechanics, including the text for Elsevier, <u>Forensic Epidemiology: Principles and Practice</u> (2016). My publications have been cited by other authors more than 4,700 times.

I have provided testimony in more than 400 civil and criminal trials in state and Federal courts throughout the United States, Canada, and Australia. Please see my CV for further details.

Paul Shorstein, Esquire
Attorney at Law

RE:     *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District
        Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 4 of 19

## Background Facts:

On October 28, 2022 at about 8:54 am Irene Roundtree was the restrained driver of a 2011 Mazda
CX-9 crossover SUV that was going a stated speed of about 55-65 mph, northbound on FL-
113/Southside Connector Blvd., near Regency Square Blvd., Jacksonville, FL, when it was struck
on the driver's side by a 2019 Wabash Duraplate semi-trailer, being pulled by a 2022 International
LT625 truck tractor, that was changing lanes and driven by Marlin Foster. Mr. Foster did not stop
or remain at the scene of the crash. The images below depict the police diagram and the subject
vehicles post-collision:



**Police diagram, Ms. Roundtree's Mazda labeled "V2"**



**Satellite view**

Paul Shorstein, Esquire
Attorney at Law

RE:    *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 5 of 19







**Ms. Roundtree's Mazda, post-collision**



**Tractor-trailer combination, photo taken by a witness**

Paul Shorstein, Esquire
Attorney at Law

RE:    *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 6 of 19

No damage estimate was provided for the Mazda for review. The provided photos show damage to the driver's side to include the front bumper cover, left front fender, left front wheel/tire, driver's door and sideview mirror and the left rear passenger door. The Mazda was not towed, no air bag deployment occurred (front side impact and side head curtain airbags are standard equipment) and it was deemed a total loss.

No damage estimate or damage photos were provided for review. The single provided photo shows the rear of the semi-trailer and the driver's side of the truck tractor only. The tractor-trailer combination was not towed and left the scene without stopping.

At the time of the crash, Ms. Roundtree anticipated the collision; she had both hands on the steering wheel (at approximately 10 and 2) and kept the wheel straight to stay in lane. She was restrained by her seatbelt, sitting upright, and looking to her left and straight ahead (alternating). On impact she gripped the steering wheel hard, pushed herself back into her seat, and braced. Her body shook from right to left and impacted the driver's side door. Ms. Roundtree was unaware of any pain or injury straight away but she felt dazed. After leaving the crash scene she went home. Later that evening she developed pain in her head, neck, and lower back.

On November 2, 2022, 4 days after the crash, Ms. Roundtree presented to Dr. Deric D'Agostino (chiropractic) with complaints of moderate to severe pain in her neck, headaches, intermittent dizziness, and pain in her mid to lower back. Ms. Roundtree underwent X-rays of the cervical and lumbar spine which were negative for acute osseous abnormality. Dr. D'Agostino initiated treatment modalities, recommended therapy 3 times a week. Ms. Roundtree underwent modalities through February 9, 2023.

On November 16, 2022, Ms. Rountree presented to Dr. Allam Morales (neurology) with complaints of headache (3-4 times per week), intermittent neck pain radiating to the bilateral trapezii and shoulders; lower back pain radiating to the hips, dizziness, and vertigo (triggered with moving her head from side to side). Dr. Morales diagnosed occipital neuralgia, cervical sprain/strain, lumbosacral strain/sprain, muscle spasms and dizziness. He recommended obtaining MRIs of the cervical and lumbar spine with persisting symptoms, recommended continuing with physical therapy; prescribed Meloxicam 15 mg and performed trigger point and occipital nerve block injections to the trapezius muscles, C5-6 paraspinal muscles, bilateral occipital nerves and supraspinatus tendon and tendon sheath.

Paul Shorstein, Esquire
Attorney at Law

RE:    *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District
Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 7 of 19

On December 7, 2022, Ms. Roundtree returned to Dr. Morales. He additionally diagnosed peripheral dizziness and prescribed Meclizine and Baclofen.

On December 19, 2022, Ms. Roundtree underwent videonystagmography and oculomotor studies which revealed the following: evidence of significant peripheral vestibular dysfunction and findings suggestive of benign paroxysmal position vertigo (BPPV); significant central vestibular dysfunction; and findings denoting peripheral or central vestibular dysfunction. Ms. Roundtree was recommended to undergo balance rehabilitation.

On December 21, 2022, Ms. Roundtree underwent MRIs of the cervical and lumbar spine, ordered by Dr. D'Agostino. The cervical spine study revealed: at C5-6, disk bulging impressing upon the anterior thecal sac with mild spinal canal stenosis (1 cm); at C6-7, shallow posterior disk herniation impressing upon the anterior thecal sac with mild spinal canal stenosis (1 cm). The lumbar spine study revealed: at L4-5, disk bulging impressing upon the anterior thecal sac; at L5-S1, posterior right-sided neural foraminal disk herniation superimposed upon disk bulging, impressing upon the anterior thecal sac, moderate right sided and mild left sided neural foraminal stenosis; and incidental renal cysts.

On December 21, 2022, Dr. Morales repeated the trigger point and occipital nerve block injections.

On January 4, 2023, Ms. Roundtree revisited Dr. Morales. Pain, muscle spasms and dizziness persisted. Dr. Morales recommended continuing physical therapy and chiropractic care, prescribed Baclofen 25 mg, Meclizine 25 mg and advised Ms. Roundtree to continue taking Tramadol as prescribed by her rheumatologist (refer to prior history).

On January 25, 2023, Ms. Roundtree started physical therapy at Rebound Rehabilitation for the dizziness and balance impairment.

On February 1, 2023, Dr. Morales provided Ms. Roundtree with prescriptions for Ibuprofen, Flexeril and recommended re-evaluation in 4 weeks.

Paul Shorstein, Esquire
Attorney at Law

RE:    *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 8 of 19

On March 1, 2023, Ms. Roundtree returned to Dr. Morales. She reported improving headaches, intermittent neck pain and muscle spasms, and pain radiating from her lower back into both hips, worse on the left, with associated muscle spasms. Dr. Morales prescribed Baclofen and placed Ms. Rountree at MMI. She was instructed to follow up as needed.

Ms. Roundtree continued attending physical therapy for balance rehabilitation through April 18, 2023.

On May 3, 2023, Ms. Roundtree presented to Dr. Andrew Cannestra (neurosurgery) with persistent pain in her neck (her primary concern) radiating to both trapezii, and lower back radiating into her buttocks. She also reported increasing weakness in both hands. Dr. Cannestra noted cervicalgia, lumbago, and herniated disks in both the cervical and lumbar spine for which he recommended epidural injections progressing to nerve ablations or microdiscectomy (for the lumbar spine) and anterior cervical discectomy and fusion (for the cervical spine), depending on response.

On June 12, 2023, Ms. Roundtree presented to Dr. Beverly Eadie (physical medicine and rehabilitation) with complaints of headache, intermittent (twice a week) and lasting around 4 hours; and bilateral neck pain. Dr. Eadie noted Ms. Roundtree was taking antibiotics for an oral infection and recommended scheduling an appointment for a cervical epidural injection after completing the course of antibiotics.

On September 13, 2023, Ms. Roundtree returned to Dr. Eadie and underwent the cervical epidural steroid injection.

*Pre-crash medical history*
Ms. Roundtree was in a prior [T-bone] traffic crash in 2012. She sustained injuries to her neck and lower back and underwent physical therapy with full resolution of symptomatology without residuals. There was also an earlier crash, around 2000, but without injury; a concussion in 2004, sustained after a trip and fall incident; and another [possible] traffic crash in July 2007 [possibly] resulting in spinal injuries, although Ms. Roundtree was unable to recall if she received pain management treatment following this crash.

Ms. Roundtree was treated at the Florida Memorial Hospital for vertigo (and Covid) in 2020.

Paul Shorstein, Esquire
Attorney at Law

RE:    *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 9 of 19


Ms. Roundtree was diagnosed with rheumatoid arthritis/osteoarthritis more than ten years prior to the crash. She would visit Dr. Swati Shah, her rheumatologist, approximately three times a year. She felt well at the time of the subject crash. Height: 5 ft 7 inches, weight: 210 lbs.

*Medical and other records reviewed for history*
Irene Roundtree, deposition
Absolute Injury and Pain Physicians
Rebound Rehabilitation Physical Therapy
Innovative Imaging
Surgery Consultants of Florida, Dr. Cannestra
Dr. Eadie, records
River City Medical Associates, Dr. D'Agostino
Answers to Interrogatories

Paul Shorstein, Esquire
Attorney at Law

RE:     *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District
        Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 10 of 19

## **Opinions of the defendant's expert, Dr. Bawab**

Dr. Bawab's substantive conclusions can be summarized as follows:

- The delta-v for the Mazda was about 4.82 mph over 124 ms, and the direction of force was from an approximately 8 o'clock direction.
- MADYMO was used to model the occupant kinematics
- Activities of daily living, such as plopping backward in a chair, hopping off of a 20 cm step landing on both feet, sneezing, and coughing generate higher forces than the subject crash.

### *General comments on Dr. Bawab's approach*

The purpose of Dr. Bawab's opinion is to provide a backdoor medical causation opinion that Ms. Roundtree was not injured in the subject collision because he (Dr. Bawab) deemed any injury to be *impossible* in the crash. Dr. Bawab made no attempt to assess the actual probability of injury from any real-world crash like the subject collision, information which can only come from observational (epidemiologic) study of injuries associated with real world crashes, not from intellectually dishonest comparisons between one of the most common causes of injury in the US to innocuous activities of daily living. Although Dr. Bawab cites to multiple publications in his report, yet none of them provide valid or reliable evidence that the injuries diagnosed in Ms. Roundtree cannot, or did not, result from the collision that she was exposed to.

The generally accepted and peer-reviewed method of crash-related injury causation analysis for a specific individual is performed by assessing the risk of injury from the collision and comparing it to the probability that the injuries or conditions would have been present at the same point in time if the collision had not occurred. The process is referred to as a "3-step" injury causation method in which improbable alternative causes are ruled out and the single most likely cause is identified. The analysis is accomplished via the application of crash reconstruction,

Paul Shorstein, Esquire
Attorney at Law

RE:    *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District
Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 11 of 19

biomechanical, medical, and epidemiologic (risk assessment) principles.[1-2345] This 3-step
methodology has been extensively described in the peer-reviewed literature, been deemed
generally accepted by Courts in the United States, and has been adopted as part of case law in
the U.S.[6-10]

The three fundamental elements or steps of an injury causation analysis are as follows:

1) Whether the injury mechanism had the potential to cause the injury in question (*aka*
general causation);

2) The degree of temporal proximity between the injury mechanism and the onset of the
symptoms reasonably indicating the presence of the injury; and

3) Whether there is a more likely alternative explanation for the occurrence of the symptoms
at the same point in time (*aka* differential etiology).

Dr. Bawab's frankly absurd comparisons to everyday activities in no way addressed whether the
subject collision *could have* caused the injuries and sequelae observed in Ms. Roundtree, the first
element of the causal analysis. Dr. Bawab's blanket denial that a mechanism existed in the subject
collision for any of Ms. Roundtree's diagnosed and persisting injuries is an uninformed assertion
with no basis in science, medicine, or the facts in this case and does not constitute an assessment
of the plausibility of her injuries resulting from the collision.

---

[1] Melia P et al. Development of the INFERENCE (INtegration of Forensic Epidemiology and the Rigorous EvaluatioN
of Causation Elements) approach to causal inference in forensic medicine. *Int J Environ Res Public Health*
2020;17:8353; doi:10.3390/ijerph17228353.

[2] Freeman MD, Zeegers M. Principles and applications of forensic epidemiology in the medicolegal setting. *Law,
Probability, & Risk* 2015; doi:10.1093/lpr/mgv010.

[3] Koehler S, Freeman MD. Forensic epidemiology; a methodology for investigating and quantifying specific causation.
*Forens Sci Med Path* 2014 Jun;10(2):217-22

[4] Freeman MD, Kohles SS. An Evaluation of Applied Biomechanics as an adjunct to systematic specific causation in
forensic medicine. *Wien Med Wochenschr* 2011;161:1-11.

[5] Freeman MD. A practicable and systematic approach to medicolegal causation. *Orthopedics* 2018;41(2):70-2.

[6] Freeman MD, Centeno CJ, Kohles SS. A systematic approach to clinical determinations of causation in
symptomatic spinal disc injury following motor vehicle crash trauma. *PM R* 2009;1(10):951-6.

[7] Hashish R, Badday H. Frequency of acute cervical and lumbar pathology in common types of motor vehicle
collisions: a retrospective record review. *BMC Musculoskeletal Disorders* 2017;18:437

[8] Bunketorp O (2017) WAD – Criteria for Evaluation of Causality. Open J Trauma 1(3):054-063.

[9] 35 F.Supp.3d 1360 United States District Court, D. Colorado. Donald L. Etherton, Plaintiff, v. Owners Insurance
Company, a Michigan Insurance Company, Defendant. Civil Action No. 10–cv–00892– PAB–KLM

[10] Etherton v. Owner Insurance Company. U.S. District Court of Appeals, 10th Circuit. Case No. 14-1164.

Paul Shorstein, Esquire
Attorney at Law

RE:    *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 12 of 19

Dr. Bawab has no information on the pre-crash condition of Ms. Roundtree's spine, or any other part of her body. He couldn't pick her out of a lineup and hasn't the faintest idea of her tolerance to any type of trauma, including the subject crash. **The tolerance of an individual to forceful external loads is only defined once it has been exceeded,** not based on comparisons to the entirely dissimilar and benign forces associated with daily activities. A review of *all* of the evidence in the subject case clearly established the fact that Ms. Roundtree's tolerance was exceeded by the forces of the subject crash.

Dr. Bawab simply ignored Ms. Roundtree's medical history like it never happened; his approach to "assessing" the cause of her injuries was to reject any evidence that she was injured in the first place. Dr. Bawab doesn't consider, much less mention the fact, that there are no plausible competing causes of Ms. Roundtree's injuries occurring at the same time as the crash.

As Dr. Bawab does not (and cannot) dispute any of Ms. Roundtree's diagnoses, and he does not provide an alternative explanation for how her diagnosed injuries would have occurred at the same time as the collision, his analysis is incomplete, and fails to account for the undeniable evidence of injury following the crash.

The concept of injury thresholds as a bright line below which no injury can occur is one that has been evaluated and rejected by the biomechanical community that is involved with the evaluation of occupant forces in motor vehicle crashes. Injury thresholds have nothing to do with the evaluation of real-world collisions and can never be used to deny the presence of a real-world injury following a collision. This is made clear in an SAE publication (J885) that summarizes human threshold data for use in government crash testing (and despite the fact that Dr. Bawan erroneously cited to this paper as support for his specious claim that the forces of the subject collision were within Ms. Rountree's tolerance):[11]

> "Such [tolerance] specifications are beyond the state-of-the-art in biomechanics except perhaps for a few academic situations. There are several difficulties which prevent a ready establishment of human tolerance levels. First, there are differences in judgment as to the specific degree of injury severity that should serve as the tolerance level. Second, large differences exist in the tolerances of different

---

[11] Human tolerance to impact conditions as related to motor vehicle design. SAE J885 2011

Paul Shorstein, Esquire
Attorney at Law

RE:   *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District
Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 13 of 19

> individuals. It is not unusual for bone fracture tests on a sample of adult cadavers
> to show a three-to-one load variation. Presumably, variations of at least this
> magnitude exist in the living population. Finally, most tolerance levels are sensitive
> to modest changes in the direction, shape, and stiffness of the loading source. The
> above considerations indicate that complete and precise definitions of human
> tolerance levels will require large amounts of data based on controlled statistical
> samples. Only in this way can the influence of age, size, sex, and weight be
> comprehensively assessed and only in this way can mean loads and statistical
> measures of scatter be linked to specific tolerance levels."

<u>*Crash severity analysis*</u>
According to the police report there were no adverse weather or roadway conditions. It was
daylight, clear and dry. The speed limit on FL-113/Southside Connector Blvd. was 50 mph,
however a review of street view imagery dated March 2022 shows 55 mph speed signs posted.

<u>Ms. Roundtree</u>, deposed on November 27, 2023 testified that she was on her way to work and
was in the far right/#3 lane on FL-113, going about 55-65 mph and no cars were ahead of her.
She intended to prepare to move into the left lane next to her, looked to her left to see if it was
clear and saw "a wall", which was the tractor-trailer. It was going faster than she was, she did not
see a right turn blinker on and it began to move into her lane. She began honking and yelling,
remained in her lane and kept the steering wheel straight so she wouldn't get pushed off of the
roadway. The tractor-trailer struck the whole driver's side of her car. She was not sure what part
of it struck her car and moved her foot from the gas to the brake when the impact occurred. The
impact shook her car for about 5-10 seconds and caused her body to move to the right and to the
left. When her body was moving to the left she recalled striking the driver's side door. The tractor-
trailer continued on after the impact, and did not stop or remain at the scene.

A witness, Ms. Figgs, contacted Ms. Roundtree at the scene after the crash and told her that she
saw the crash, and followed the tractor-trailer and took a photo of it for her.

No deposition of <u>Mr. Foster</u> was provided. In court documents he stated that he was coming from
Ollies Bargain Outlet in Jacksonville, FL and was going to Americus, GA. His trailer was empty
and he was unaware he had been in a crash with Ms. Roundtree.

Paul Shorstein, Esquire
Attorney at Law

RE:    *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 14 of 19

<u>Defendant Werner Enterprises</u> stated in court documents that Mr. Foster was unaware he had been in a crash with Ms. Roundtree, and that the International's ECM was not downloaded.

The police report stated that the semi-trailer contacted the Mazda when it was changing from the right lane into the left lane and it continued on in an unknown direction on Regency Square Blvd. The description of the tractor-trailer was an unknown color tractor with a silver semi-trailer that had the company name of WERNER on it. The speed estimate of the Mazda was 45 mph.

*Analysis:*
I have reviewed Dr. Bawab's reconstruction results, and do not have any major disagreement with the estimate of ~4.8 mph delta V, but I'm unsure as to how he arrived at 2.2 g of peak acceleration from a 124 msec crash pulse, as this duration for a 4.8 mph collision results in peak acceleration of 3.9 g, based on an average acceleration of 1.9 g (peak acceleration is calculated by doubling the average).

*Is any collision comparable to activities of daily living?*
As noted above, Dr. Bawab claimed that the subject collision produced forces no greater than the loads observed in studies of "activities of daily living." Such comparisons are misleading and deceptive, and based on the junk science premise that if the occupant acceleration value of a crash can be said to be similar to that of some trivial sounding event, then this means that the injury potential of the crash and the trivial event is the same. This antiscientific myth has no application or use outside of the defense of injury litigation.

It should be patently obvious how ridiculous and frankly dishonest the comparison is between *any* collision and *any* everyday activity; there is no biomechanical similarity between a crash and an ADL. The direction, duration, and rapidity of acceleration that results in the kind of violent movement that occurs even in a low-speed crash is noncomparable in all respects to the self-generated, slow onset and long duration accelerations of daily activities.

The *actual* risk of injury from a lower speed crash is not determined by a comparison to an activity that never causes injury, of course. Such determinations are made by examining epidemiologic data regarding real world crashes and the types of injuries that result from them. This is precisely what my colleagues and I did in a recent peer-reviewed research publication, in which we noted

Paul Shorstein, Esquire
Attorney at Law

RE:     *Irene Roundtree et al. v Marlin Foster et al.*, *Case No: 3:23-CV-358-BJD-JBT*, *District
        Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 15 of 19

the following:[12]

> "…the theory that serves as the operating principle for the methodology, that
> acceleration is a proxy for injury risk in low speed or minimal damage crashes,
> which is the rationale for the comparison between a crash and non-injurious ADLs,
> is demonstrably false. Even at the lowest levels of impact severity in a rear impact
> crash, the results of both crash testing and epidemiologic data from real-world
> crashes indicate a substantial (i.e., >20%) risk of at least some degree of injury. **In
> contrast, everyday activities are benign events with virtually no injury risk
> whatsoever.**
>
> **If the magnitude of the accelerations resulting from crashes and ADLs can
> be said to be even roughly comparable, this fact only serves as concrete
> evidence that occupant acceleration is not a proxy for injury risk.** "

Regarding the novel nature of such comparisons as a basis for evaluating injury risk, we wrote:

> "**There is no other example in the biomedical literature in which the
> established injury risk of any traumatic event is overlooked in favor of a
> comparison between the acceleration of the event and a non-injurious
> activity.** Although there may be multiple shared attributes of traffic crashes and
> some ADLs, just as there are multiple shared attributes of stepping down from a
> stair and falling down a stair (i.e., the travel distances are the same, gravity is 9.81
> m/s² in both scenarios), alluding to the absence of injury while ordinarily walking
> down stairs sheds no light on the frequency of injury from falling down stairs. **The
> comparison is inapt and should not be made.**"
>
> If we use the real world 11 km/h [6.8 mph] delta V rear impact injury risk from the
> present study (54%) and compare it to the highest estimated ADL-related risk (<<1
> in 3,650 [0.027%] for sitting), **then even using the most conservative estimates,
> the crash presents a risk of injury that is at least 2,000 times greater than the**

---

[12] Nolet PS, Nordhoff L Kristman KL, Croft AC, Zeegers MP, Freeman MD. Is acceleration a valid proxy for injury risk
in minimal damage traffic crashes? A comparative review of volunteer, ADL and real-world studies. *Int J Environ Res
Public Health* 2021 2021;18:2901; https://doi.org/10.3390/ijerph18062901.

Paul Shorstein, Esquire
Attorney at Law

RE:    *Irene Roundtree et al. v Marlin Foster et al.*, *Case No: 3:23-CV-358-BJD-JBT*, *District Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 16 of 19

> **"high risk" ADL of sitting**. *This ratio likely underestimates the actual injury risk disparity between frontal-side impacts and ADLs by a factor of at least 10 times.*

<u>*Can a MADYMO computer simulation show that Ms. Roundtree could not be, should not have been, or was not injured in the subject collision?*</u>

Dr. Bawab devoted a large portion of his report to the description of a MADYMO computer animated cartoon crash dummy simulation that he performed in an attempt to model the forces that would have been applied to Ms. Rountree's body during the collision sequence. I am quite familiar with this software, and in fact am engaged in a multi-year funded research project to explore the ability of MADYMO simulations to predict injury risk in human populations, which, at the present time, there is no evidence for (contrary to the implications of Dr. Bawab).

The MADYMO computer simulation animation portrays a flaccid and inert cartoon crash test dummy, not a representation of a live human. At best, it indicates what *might* occur to a crash test dummy in a computer-generated crash environment. It is not an indication of what does or does not happen to a live actual human being in an actual crash event, except for the grossest of motion (kinematic) analyses

The MADYMO computer model lacks bone, cartilage, muscles, spinal fluid, and blood vessels, or any representative elements of a human vertebra or a shoulder joint. This is because it is intended to reproduce a crash test dummy, and not a human body. See a depiction of the cartoon crash test dummy within the MADYMO environment below:



Paul Shorstein, Esquire
Attorney at Law

RE:     *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 17 of 19


One has to wonder how it is that Dr. Bawab arrived at any conclusions regarding the risk of injury from the subject collisions to any part of Ms. Rountree's body, given the computerized crash test dummy program that he relied on doesn't *have any body parts to injure*. The MADYMO contains no information on injury thresholds in any populations, and Dr. Bawab's representation that the MADYMO simulation has any relevance or meaning specific to the injuries sustained by Ms. Roundtree is misleading.

[*Note:* I am requesting that the MADYMO run file utilized by Dr. Bawab be shared so that I may examine the input parameters that were used for the simulation.]

*Can a biomechanical analysis demonstrate that Ms. Roundtree was not injured in the subject crash?*

Traumatic spinal disk injuries have been described in the peer-reviewed literature as occurring in low to moderate force events, such as minimal damage traffic crashes and roller coaster rides, but also with even more mild forces, including therapeutic manipulation of the spine, and even sneezing.[13-17] It is accurate to state that there is no established or generally accepted lower force threshold at which it can be said that an acute intervertebral disk (or any other acute leading to chronic) injury in any part of the spine cannot occur. Dr. Bawab's claims to the contrary are contrived and easily disproven, not to mention at odds with the specific facts in Ms. Roundtree's case.

---

[13] Giuliano V, Giuliano C, Pinto F, Scaglione M. The use of flexion and extension MR in the evaluation of cervical spine trauma: initial experience in 100 trauma patients compared with 100 normal subjects. Emerg Radiol. 2002;9(5):249-53.
[14] Freeman MD, Croft AC, Nicodemus CN, Centeno CJ, Welkins WL. Significant spinal injury resulting from low-level accelerations: A case series of roller coaster injuries. Arch Phys Med Rehab November 2005;86:2126-30.
[15] Oppenheim JS, Spitzer DE, Segal DH. Nonvascular complications following spinal manipulation. Spine J. 2005;5(6):660-6.
[16] Lutz JD, Smith RR, Jones HM. CT myelography of a fragment of a lumbar disk sequestered posterior to the thecal sac. AJNR Am J Neuroradiol. 1990;11(3):610-1.
[17] Sadanand V, Kelly M, Varughese G, Fourney DR. Sudden quadriplegia after acute cervical disc herniation. Can J Neurol Sci. 2005;32(3):356-8.

Paul Shorstein, Esquire
Attorney at Law

RE:   *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 18 of 19

A leading authority on the topic of spinal disk injuries, Prof. Michael Adams, wrote in a 2012 textbook called "The Biomechanics of Back Pain,"[18] that

> ***"The magnitude of forces required to cause an individual disc to prolapse cannot reliably be predicted on the basis of gender, age, and spinal level."* [page 263],** and that

> ***"Most spinal compressive loading comes from back muscles, and forces are likely to rise to high levels during sudden and alarming incidents. These forces are difficult to quantify in retrospective analysis."* [page 264],** and

> ***"Clearly, to assume that the forces acting on the spine during whiplash are small just because the vehicle impacts are usually of low velocity would be a serious mistake. Muscle forces can be magnified in alarming situations, and if the muscles do not have time to react, then the underlying cervical spine is extremely vulnerable to bending."* [pages 170-1]**

It is clear that Dr. Bawab's approach to providing his opinions regarding Ms. Roundtree's injuries is characterized by authorities in the field of spinal biomechanics as a "serious mistake."


***Conclusions***

I have only addressed a fraction of the junk science methods and conclusions that constitute Dr. Bawab's report in this rebuttal and am prepared and willing to provide more detailed information on the remainder of his unscientific applications of experiments to real world observations of injury, in order to illogically imply that the injuries were impossible, regardless of the observations.

Causal evaluations for crash-related injuries do not require the imprimatur of an engineer or crash reconstructionist in order to determine that an injury *really* occurred. Such a practice only exists in and for the defense of injury litigation. The application of the generally accepted and validated 3-step causation methodology described in my prior report to the facts surrounding Ms. Roundtree's spinal injuries demonstrates that the subject crash is the most probable cause of her injuries, by far.

---

[18] Adams M et al. Biomechanics of back pain. London, UK, Churchill Livingstone, 2012.

Paul Shorstein, Esquire
Attorney at Law

RE:   *Irene Roundtree et al. v Marlin Foster et al., Case No: 3:23-CV-358-BJD-JBT, District Court, Middle District of Florida, Jacksonville Division*

February 21, 2024

Page 19 of 19

Governmental and academic institutions use biomechanical analysis of injury events to determine *how* a medically observed injury occurred, and never to determine *whether* the injury occurred. Dr. Bawab's methods in this case have contorted the definition and application of biomechanics as the discipline is used outside of litigation.

Junk science is defined as the use of technical jargon, inapplicable mathematical formulae, and irrelevant published research as a means of obscuring the fact that there is no valid basis for an opinion. This is an apt description for the approach used by Dr. Bawab in this case, including his meaningless citation to multiple publications that in no way support the application of his methods, much less his conclusions.

The preceding opinions were given as reasonable medical, and scientific probabilities. I reserve the right to amend any of my opinions should new information come to light.

Very truly yours,

Michael D. Freeman, MedDr, PhD, MScFMS, MPH, FRCPath, FFFLM, FACE, DLM

**David Jenkins Memorial Professor and Chair in Forensic and Legal Medicine**
Faculty of Forensic and Legal Medicine, Royal College of Physicians (London, UK)

**Associate Professor of Forensic Medicine,**
Care and Primary Healthcare Research Institute**,** Faculty of Health, Medicine, and Life Sciences, Maastricht University, Maastricht, Netherlands

**Clinical Professor of Forensic Psychiatry**
Department of Psychiatry, School of Medicine, Oregon Health & Science University

Fellow, Royal College of Pathologists (UK)
Fellow, Faculty of Forensic and Legal Medicine, Royal College of Physicians (London, UK)
Fellow, American College of Epidemiology
Member, American Society of Biomechanics